UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| CASSIE J. SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 4:05-CV-00025 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff, Cassie J. Smith ("Plaintiff"), appeals the denial of her application for Social Security Disability Income Benefits ("DIB") or to Supplemental Security Income ("SSI"). She challenges the Administrative Law Judge's ("ALJ") finding that she was not disabled within the meaning of Titles II and XVI of the Social Security Act ("Act"). *See* 42 U.S.C. §§ 405(g) and 1383(c)(3).

Plaintiff applied for DIB and SSI on May 28, 2002, alleging an onset date of August 2001[1]. After her application was denied initially and on reconsideration, Plaintiff requested a *de novo* ALJ hearing. On October 29, 2004, the ALJ held that Plaintiff was not disabled within the meaning of the Act, and Plaintiff requested Appeals Council review. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. Plaintiff now seeks judicial review of the Commissioner's final decision under authority of 42 U.S.C. §§ 405(g).

---

[1] Plaintiff initially alleged an onset date of January 1, 1999 (Tr. 302), but later amended her alleged onset date to August 2001 (Tr. 655).

## I.   BACKGROUND

Plaintiff is twenty four years old, and has had two years of college education (Tr. 15, 302).  Her past relevant work experience is a housekeeping supervisor and cleaner (Tr. 15).  Plaintiff claimed that she could no longer work due to back problems, kidney stones and kidney problems (Tr. 15, 302, 333).

Plaintiff testified that she had a metabolic disorder that caused her to get frequent calcium-based kidney stones, which resulted in back spasms, trouble walking, frequent infections, and pain when passing a stone (Tr. 333).  She also claimed that could not do housework and that bathing, showering, and dressing all caused back pain (Tr. 333).  Plaintiff testified that she spent a typical day at home (Tr. 632).  She felt tired, weak, and exhausted all the time and did nothing around the house (Tr. 632).  She used pain medication all the time (Tr. 632).  She further testified that even sitting was uncomfortable, and she could not sit through a movie (Tr. 632).  She claimed that simple bathing made her completely exhausted (Tr. 651), and that she sometimes passed out due to pain (Tr. 650).

The ALJ concluded that Plaintiff was not disabled within the meaning of the Act[2] and that, despite having "severe" impairments, Plaintiff could still perform substantial gainful activity ("SGA").

**A.   Medical Evidence**

Plaintiff was treated at the emergency room for recurrent kidney stones on numerous occasions.  In August 2000, Plaintiff went to the emergency room complaining of left flank pain;

---

[2] "Disability" means the inability to perform substantial gainful activity because of a physical or mental impairment which can be expected to cause death or which has lasted or can be expected to last for twelve consecutive months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).

2

she was treated with medications and discharged (Tr. 478-79). In November 2000, she visited the emergency room and complained of flank pain and vomiting; scans showed a stone near the ureter (at the ureterovesicle junction), and Plaintiff was given medication with good relief (Tr. 486-88). In June 2001, she went to the emergency room complaining of "kidney stone-type pain" (Tr. 473). Tests showed multiple stones but none in the ureter; she was given fluids and medication with relief (Tr. 474).

Plaintiff treated with Dr. Sisir Dhar, a nephrologist, in September 2001 (Tr. 545-46). She reported pain in the lumbar and low back region, for which she had used various medications; she reported no hematuria (blood in the urine) or dysuria (Tr. 545). Dr. Dhar's examination was unremarkable; he advised Plaintiff to discontinue using Lortab and Darvocet and to try a muscle relaxant (Robaxin) instead (Tr. 545-46).

In October 2001, Plaintiff was seen in the emergency room for left flank pain. Tests showed a possible small calculus and mild obstructive hydronephrosis (Tr. 419, 539-40).

Plaintiff treated with Dr. Bharat Dave, a urologist, in November 2001. He noted that prior tests showed elevated oxalate was likely causing the stones, and that she had been prescribed medication for this condition but had been "off these medications for some time" (Tr. 538). Dr. Dave advised her to follow a low oxalate diet, increase her water intake and resume her prescribed medications (Tr. 538).

On January 25, 2002, Plaintiff was seen in the emergency room. Tests showed a "tiny" stone that would probably pass without difficulty (Tr. 591). The following day, she returned for aggressive hydration and pain control (Tr. 586).

In February 2002, Plaintiff complained of flank pain and thought she had a kidney

3

stone; she was given medication which helped, but she still had some discomfort and decided to stay in the hospital (Tr. 578).

In April 2002, Plaintiff was given Demerol and Phenergan in the emergency room for complaints of flank pain and vomiting (Tr. 165, 560).

In May 2002, Plaintiff was treated in the emergency room for gastroenteritis (diarrhea), for which she was prescribed medication and instructed to see her regular physician (Tr. 164, 558). In October 2002, she was treated in the emergency room for a urinary tract infection (Tr. 162).

Dr. Phillip Mosbaugh, a urologist, examined Plaintiff in November 2002 (Tr. 357). He observed that although she claimed to be doing all of the things necessary to prevent stones (which included taking medications and drinking adequate fluids), her urine output was "woefully inadequate" (Tr. 357). Dr. Mosbaugh advised Plaintiff that increasing her urine output by drinking more fluids was the "single most important thing" she could do, and he commented that her stone disease should be under control if she adhered to these measures (Tr. 357).

On December 11, 2002, Plaintiff went to the emergency room and had a markedly tender abdomen. Tests showed a stone near the left ureter (Tr. 364, 380). The physician indicated she could wait to see if she could pass the stone, or she could have the stone removed (Tr. 364). Ms. Smith chose the removal, which was done by cystoscopy and uteroscopy (Tr. 365).

On December 31, 2002, Plaintiff was treated in the emergency room for complaints of intermittent left flank pain (Tr. 156). Tests showed an 8x6 mm renal calculi, which was unchanged from the November 2002 image (Tr. 153). She was given medication which

provided good relief (Tr. 156).

Plaintiff returned to the hospital the next day, January 1, 2003 with complaints of left flank pain, nausea and vomiting (Tr. 150, 152). A CT scan showed an 8mm stone and "mild" hydronephrosis of the left kidney (Tr. 133). Physicians decided to admit her for observation, intravenous hydration and pain control, and ordered a urology consult (Tr. 152).

On January 22, 2003, tests showed that the prior stones were no longer evident, and indicated no other significant findings (Tr. 123). Plaintiff treated with Dr. Pulkit Patel, a urologist, the same day (Tr. 46). She reported having passed two stones since her last visit, and said she was not having much pain (Tr. 46). After reviewing Plaintiff's recent KUB results (a diagnostic image of the kidneys, ureter and bladder), Dr. Patel told her that the uretal stones were gone and that she did not require pain medication unless a stone moved from her left kidney into her ureter (Tr. 46). He instructed Plaintiff to return in six months (Tr. 46).

In June 2003, Plaintiff was seen in the emergency room complaining of a sudden onset flank pain (Tr. 63). A pelvic CT scan showed a small calculus (about 5 mm) in the left utervesical junction, and "mild" hydronephrosis (Tr. 71). She was given medication and discharged with instruction to drink water and follow-up with her regular doctor (Tr. 64).

A November 2003 ultrasound showed normal right kidney and bladder, but moderate hydronephrosis due to a calculus in the ureter (Tr. 186). Plaintiff visited the emergency room a few days later (Tr. 173), where tests still showed a 7 mm stone in the left ureter (Tr. 177). She was given medication for pain and discharged with instructions to set up an appointment with a specialist (Tr. 173-74).

When she returned to the emergency room in early December 2003, Plaintiff was

instructed to see a urologist (Tr. 170-72). In mid-December 2003, she visited urologist Richard Selo (Tr. 251). Tests showed a stone in the left ureter (Tr. 251, 154) and Dr. Selo recommended "ESWL," or extracorporeal shock wave lithotripsy[3] (Tr. 251). Dr. Selo performed the procedure in December 2003 (Tr. 250) and subsequent studies in December 2003 and January 2004 were negative, showing no further calcifications (Tr. 246, 248). In December 2003, Plaintiff told Dr. Selo that she had passed numerous stone fragments, but was doing well with only mild flank pain and no nausea or vomiting (Tr. 252).

In February 2004, Dr. Selo noted that tests showed Plaintiff's urine volume was low, even though she said she was drinking 13 to 14 glasses of water per day (Tr. 253). Dr. Selo noted that Plaintiff's current levels were significantly low (Tr. 253). Dr. Selo instructed her to drink plenty of fluid, drink water with lemon or lime juice, reduce sodium intake and be reevaluated in six months (Tr. 253).

Plaintiff saw Dr. Rita Mankus, a family physician, periodically between December 2000 and July 2001 (Tr. 490-513). In December 2000, Dr. Mankus noted that Plaintiff might have hypercalciuria, which could be modified by diet but might also require medication (Tr. 512). In February 2001, Plaintiff reported that her pain was relieved by Nortab (Tr. 516).

In May 2001, Plaintiff treated with Dr. Dana Pfaff, for complaints of persistent urinary tract infections (Tr. 501). A urinalysis showed trace nitrates, which Dr. Pfaff indicated was "minimally abnormal" (Tr. 501). Dr. Pfaff performed a cystoscopy, which showed no evidence of bladder pathology and no interstitial cystitis (Tr. 498).

---

[3] Lithotripsy is the use of shock waves to break up kidney stones (or other types of renal or gallbladder stones).

In June 2001, Plaintiff reported to Dr. Mankus that medications helped; she only used Lortab occasionally; she felt much better; and her pain was tolerable (Tr. 497). In July 2001, she reported symptoms of a urinary tract infection (Tr. 492).

In October 2002, Plaintiff sought chiropractic manipulations for recurrent low back pain (Tr. 55). Chiropractor Duane Binder indicated that she had "mild" lumbar scoliosis, but no degenerative disc disease, spondylosis or evidence of disc pathology or radiculopathy (Tr. 55). Plaintiff continued to treat with Chiropractor Binder once or twice a month for chiropractic manipulations through June 2003 (Tr. 50-53, 391-403). In January 2003 she told Chiropractor Binder that she was doing "pretty good" and "okay" (Tr. 53). She told him in May 2003 that she had recently passed a stone (Tr. 51); she also reported passing stones in June 2003 (Tr. 50, 51).

In April 2003, Plaintiff complained of "spasms" and blood in her bowel movements, and Dr. Leuking recommended a colonoscopy (Tr. 121). The test revealed no abnormalities other than internal hemorrhoids (Tr. 103-05). She was instructed to follow a high fiber diet (Tr. 103). In May 2003, she told Dr. Leuking that the rectal bleeding had improved, but she had developed persistent epigastric pain (Tr. 100). Dr. Leuking ordered an esophagogastroduodenoscopy (EGD), which showed "mild" gastritis and a small hiatal hernia (Tr. 84, 100).

Between October 2003 and April 2004, Plaintiff visited another physician whose name is not identified (Tr. 234-44). When she reported feeling weak in November 2003, the physician noted she looked well (Tr. 243). Plaintiff described passing a lot of sand (the broken kidney stones) after the December 2003 lithotripsy (Tr. 239). She reported mild back pain and a higher energy level in February 2004, and the physician noted she looked well (Tr. 236). Plaintiff complained of rib pain and a fast heartbeat in March 2004 (Tr. 235) and back pain in April 2004

7

(Tr. 234).

In addition to evidence of Plaintiff's medical treatment, the record included a consultative examination report and several medical opinions requested by the state agency. Michael Kennedy, M.D., examined Plaintiff in July 2002 (Tr. 406-10). Dr. Kennedy reviewed Plaintiff's complaints and performed a complete physical examination. He observed that she walked normally, could stand on either leg and squat without difficulty, and appeared comfortable in a seated position; her abdomen was not tender and he observed no rebound or guarding; and his musculoskeletal examination was unremarkable, showing no muscle spasm, normal range of motion and no neurological abnormalities (Tr. 407-10). Dr. Kennedy's impression was nephrolithiasis (kidney stones). He indicated that Plaintiff should be able to work an eight-hour day in a seated, standing or ambulatory position; that she could lift ten pounds occasionally and 20 pounds frequently; and that she had full use of her arms and legs for grasping, pushing, pulling, manipulating and operating controls (Tr. 410).

State agency medical consultant B. Whitley, M.D., reviewed the record evidence in August 2002 (Tr. 349-55). Dr. Whitley concluded that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently, and could both stand/walk and sit for about six hours in an eight-hour work day (Tr. 349). Another state agency physician, A. Landwehr, M.D., affirmed Dr. Whitley's finding in February 2003 (Tr. 355).

**B.     Vocational Expert Evidence**

Stephanie Archer, a vocational expert ("VE"), appeared and testified at the hearing. When asked to consider a hypothetical person of Plaintiff's age, education, and past work experience who was capable of work at the light and the sedentary exertional levels, the VE

8

testified that such an individual in Indiana could do jobs such as: assemblers at light, unskilled level, 18,000; assemblers at sedentary level, 4,000; machine operators at light level, unskilled level, 6,500; machine operators at sedentary level, 2,400; general office clerks at light level, 3,000; and general office clerks at sedentary level, 900.

Plaintiff's attorney asked the VE if the hypothetical person were taking medication that caused dizziness, sleepiness, and fainting from pain if the hypothetical person would be able to hold such jobs. The VE testified that a hypothetical person would not be able to hold such jobs if the characteristics were severe enough. When asked about absenteeism, the VE testified that the typical number of days Plaintiff missed would preclude any work.

**C.    The ALJ's Decision**

The findings of the ALJ were as follows:

1.    The claimant met the disability insured status requirements of the Act at all times relevant to this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant's metabolically active stone disease and facet syndrome are considered "severe" based on the requirements in Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(b).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned fins the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: light exertional level work with the following restrictions: ability to alternate into a sitting or standing position at his or her option for periods of one to two minutes per hour; no kneeling, crawling, or climbing of ropes, ladders or scaffolds; no walking on uneven surfaces; no work at unprotected heights, around dangerous machinery.

7. The claimant is unable to perform any of her past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

8. The claimant is a "younger individual between the ages of 18 and 44" (20 C.F.R. §§ 404.1563 and 416.963).

9. The claimant has "more than a high school (or high school equivalent) education" (20 C.F.R. §§ 404.1568 and 416.968).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 C.F.R. §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 C.F.R. §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.20 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as an assembler, 18,000 light, 4,100 sedentary; machine operator, 6,500 light, 2,400 sedentary; general office clerk, 3,000 light, 900 sedentary.

13. The claimant was not under a "disability," as defined in the Social Security Act, at

any time through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

## II.   STANDARD OF REVIEW

This court's review of the Commissioner's decision is a limited one.  Unless there is an error of law, the court will uphold the Commissioner's findings of fact if they are supported by substantial evidence.  *Griffth v. Callahan*, 138 F.3d 1150, 1152 (7th Cir. 1998).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971).  In making a substantial evidence determination, the court will review the record as a whole, but will not reevaluate the facts, re-weigh the evidence or substitute its own judgment for that of the Commissioner.  *Griffth*, 138 F.3d at 1152; *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).  That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result."  *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

With respect to credibility determinations, the ALJ is in the best position to observe the demeanor and veracity of the testifying witnesses.  *Griffth*, 138 F.3d at 1152.  The court will not disturb the ALJ's weighing of credibility so long as those determinations are based on some support in the record and are not "patently wrong."  *Id.*; *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  However, the district court is required to critically review the evidence and not simply rubber-stamp the Commissioner's decision.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

## III.   DISCUSSION

"Benefits are available only to those individuals who can establish disability under the terms of the Social Security Act."  *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).  Under

section 423(c)(1)(B)(1), it is well-established that to receive benefits, a disability must have begun or had its inception during the period of insured status. *Bastian v. Schwiker*, 712 F.2d 1278, 1280 (8th Cir. 1983); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir.), *cert. denied*, 444 U.S. 952 (1979). The Seventh Circuit has established that a claimant has the burden of establishing that she is disabled within the meaning of the Social Security Act on or before the date her insured status expired. *Estok*, 152 F.3d at 640; *Meredith v. Bowen*, 833 F.2d 659 (7th Cir. 1987); *Owens v. Heckler*, 770 F.2d 1276; 1280 (5th Cir. 1985); *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1984); *Jeralds v. Richardson*, 445 F.2d 36, 39 (7th Cir. 1971). "The law requires that a claimant demonstrate her disability within the proscribed period of eligibility not prior to or subsequent to the dates in question." *Jeralds*, 445 F.2d at 39. Therefore, "any condition that had its onset or became disabling after plaintiff's insured status expired may not be used as a basis for entitlement to disability benefits." *Couch v. Schweiker*, 555 F. Supp. 651, 654 (N.D. Ind.1982). Plaintiff bears the burden of showing through testimony and medical evidence supported by clinical data and laboratory diagnosis that he was disabled during the period in which he was insured. *Jeralds*, 445 F.2d at 38-39; See also *Reading v. Matthews*, 542 F.2d 993, 997 (7th Cir. 1976).

The claimant must show that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations to the Act create a five-step inquiry in determining whether a claimant is disabled. As previously discussed, the ALJ must consider the applicant's claim in the following sequence:

>(1) whether the claimant is currently employed; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one listed by the Secretary; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing any work in the national economy. *Clifford*, 227 F.3d at 868; citing *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

"An affirmative answer leads either to the next step, or on Steps 3 and 5, to a finding that the claimant is disabled. *Clifford*, 227 F.3d at 868. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that the claimant is not disabled." *Id.* The initial burden in steps one through four is on the plaintiff; only at step five does the burden shift to the Commissioner. *Id.*

The Plaintiff disagrees with the ALJ's finding that she was not disabled within the meaning of the Act. In particular, the Plaintiff argues that the ALJ committed reversible error by finding that she did not have a listing-level impairment. Plaintiff also contends that the ALJ's RFC is not supported by substantial evidence.

**A.   Listing-Level Impairment**

Plaintiff contends that the ALJ erred by finding that she did not have a listing-level impairment[4]. Interestingly, she argues that her kidney stone disease medically equaled the criteria of Listing 3.03 ("Listing"), "Asthma." The listing sets forth the medical and functional criteria for an automatic finding of disability, but it is useful to remember the manner in which the listings are used. According to the Secretary:

>(a) What is the purpose of the Listing of Impairments? The Listing of Impairments (the listings) is in appendix 1 of this subpart. It describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work

---

[4]A listing-level impairment is an impairment that the Commissioner considers conclusively disabling under section 1.03 of 20 C.F.R. Subpart P, Appendix 1.

13

experience.

\* \* \*

(c) How do we use the listings?

    (1) Each body system section in parts A and B of appendix 1 is in two parts: an introduction, followed by the specific listings.

    (2) The introduction to each body system contains information relevant to the use of the listings in that body system; for example, examples of common impairments in the body system and definitions used in the listings for that body system. We may also include specific criteria for establishing that your impairment(s) satisfies the criteria of a particular listing in the body system. Even if we do not include specific criteria for establishing a diagnosis or confirming the existence of your impairment, you must still show that you have a severe medically determinable impairment(s), as defined in §§ 404.1508 and 404.1520(c).

\* \* \*

    (4) Most of the listed impairments are permanent or expected to result in death. For some listings, we state a specific period of time for which your impairment(s) will meet the listing. For all others, the evidence must show that your impairment(s) has lasted or can be expected to last for a continuous period of at least 12 months.

\* \* \*

20 C.F.R. § 404.1525.

The relevant portion of Listing 3.03 for Asthma provides:

> Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

20 C.F.R. Pt. 404, Subpt. P, App. 1

The Plaintiff analogizes her hospitalizations for kidney stones to that required for asthma. The Defendant argues that Plaintiff's argument reflects a fundamental misunderstanding regarding how the Listing of Impairments is arranged and how medical equivalence is determined. After careful review of §404.1525, this Court agrees.

It is well settled that the Plaintiff bears the burden of showing that she meets all the

14

requirements of a listed impairment. *Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir.1999). Plaintiff's nephrolithiasis is subject to Listing 6.02, "Genitourinary Impairments." To meet these listings medical evidence must show impaired renal function resulting in one of the following: (1) chronic hemodialysis; (2) kidney transplantation; or (3) persistently elevated serum creatine causing one of five complications (osteodystrophy, pericarditis, persistent fluid overload, intractable pruritus or persistent anorexia). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 6.02 (describing criteria for listing-level renal impairment). Plaintiff's impairment does not meet the requirements of this listed impairment, and thus has failed to meet her burden. She also fails to meet her burden of showing that she meets all the requirements of a listing for asthma. She argues that the asthma listing is "closely analogous" due to her frequent visits to the Emergency Room and her admissions. Asthma, a disorder of the respiratory system, is completely unrelated to kidney stones or renal impairments, and contradicts the manner in which the Listings are used. Plaintiff's argument, while creative, is flawed at best.

Next, Plaintiff argues that the ALJ erred by failing to use a medical expert to determine whether her kidney stones were medically equivalent to the asthma listing. Again, Plaintiff's argument fails. The regulations clearly provide that whether or not a medical expert should be called is a matter left to the ALJ's discretion. *See* 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii). Moreover, Dr. Landwehr and Dr. Whitley, state agency consultants, both concluded that Plaintiff's impairments were not medically equivalent to any listed impairment and indicated same on "Disability Determination and Transmittal Form" (SSA-831) (Tr. 256, 258). The signature of a state agency medical consult on an SSA-831 "Disability Determination and Transmittal Form" ensures that appropriate consideration has been given to the question of

15

medical equivalence.  Social Security Ruling 96-6p.  State agency consultants are "highly qualified physicians . . . who are also experts in Social Security disability evaluations," 20 C.F.R. §§ 404.1527(f)(2)(I), 416.927(f)(2)(I).  Dr. Landwehr and Dr. Whitley were both qualified experts and the ALJ appropriately relied on their opinions.  Again, Plaintiff's argument is wanting, and she has not met her burden to prove that she should prevail at Step Three of the sequential analysis.  *See* 20 C.F.R. § 404.1520(d).

  **B.**  **The Residual Functional Capacity**

When sequential analysis proceeds beyond Step Three to Steps Four and Five, and ALJ must make a RFC assessment.[5]  That is, an ALJ decides whether an applicant, notwithstanding severe impairment, retains physical and mental ability to perform activities generally required by competitive, remunerative work.  *See* 20 C.F.R. § 404.1545; Social Security Ruling 96-8p, 61 F.R. 34474 (July 2, 1996).  The judge assesses the applicant's physical, mental, and sensory abilities, evaluates how they apply to the applicant's work-related functioning, and finally considers whether the applicant can sustain work-related activities in a work setting on a regular and continuing basis.  *Id.*

Here, the ALJ found that Plaintiff had the following RFC: light exertional level work with the following restrictions: ability to alternate into a sitting or standing position at his or her option for periods of one to two minutes per hour; no kneeling, crawling, or climbing of ropes, ladders or scaffolds; no walking on uneven surfaces; no work at unprotected heights, around dangerous machinery (Tr. 19).

---

[5]RFC is defined as "what you can still do despite your limitations."  20 C.F.R. § 416.945(a).

Plaintiff disagrees with ALJ's RFC determination. She argues that the determination is not supported by substantial evidence in the evidence taken in the whole. She further challenges the ALJ's finding that her allegation of disabling pain was not fully credible.

Careful review of the record indicates that the ALJ considered all medical and other evidence in arriving at his RFC determination. The ALJ provided a thorough and lengthy review of Plaintiff's medical evidence and provided a detailed explanation of his finding. The ALJ concluded that, while there is no question Plaintiff has severe metabolically active stone disease and facet syndrome, she is not precluded from all competitive work activity (Tr. 19). The ALJ cited the medical evidence that showed that Plaintiff's condition had improved and that compliance with treatment had brought her stone disease under control (Tr. 19).

The ALJ relied on the opinion of Dr. Kennedy, a state agency doctor, who reviewed Plaintiff's complaints and examined Plaintiff. Dr. Kennedy opined:

> In regard to the workplace, claimant should be able to work 8 hours a day in a seated, standing or ambulatory position. She should be able to lift 10 pounds frequently and 20 pounds occasionally. She has full use of her upper bilateral extremities in terms of grasping, pushing, pulling or manipulating. She has full use of her bilateral lower extremities for operating foot controls. She should be able to work around moving machinery and continuously operate automotive equipment. She should have no additional difficulties with working in extremes of temperature or humidity. She can tolerate exposure to dust, fumes, or gas. She can bend, squat, craw, or climb. She should not work around unprotected heights.

(Tr. 406-10).

The ALJ further relied on the opinions of Dr. Landwehr and Dr. Whitley, who concluded that Plaintiff had the ability to lift, stand/walk and sit consistent with light work (Tr. 349). The ALJ's reliance on the medical opinions of Dr. Kennedy, Dr. Landwehr, and Dr. Whitley was

17

appropriate and support his RFC finding.

Moreover, in reaching his conclusion, the ALJ relied on the VE's testimony that Plaintiff was capable of performing a significant number of jobs in the regional economy. The ALJ committed no error in relying on the VE's testimony.

Finally, with regard to Plaintiff's challenge of the ALJ's finding that her allegation of disabling pain was not fully credible, Plaintiff's argument fails on this point as well. The medical evidence showed that Plaintiff was non-compliant with her physicians' instructions regarding how to avoid kidney stones. The ALJ also considered Plaintiff's lifestyle. He noted that while Plaintiff alleged she was restricted to an extremely sedentary lifestyle, there was nothing in the record to indicate a necessity for such a lifestyle (Tr. 19).

This Court concludes that the ALJ's RFC determination is supported by substantial record evidence, is not "patently wrong," and will not, therefore, be disturbed. *See Schmidt v. Barnhart*, 395 F.3d 737, 747 (7th Cir. 2005). For all these reasons, Plaintiff's second point of error also fails.

## IV.   CONCLUSION

Based on the foregoing, the decision of the Commissioner is hereby **AFFIRMED**.

**IT IS SO ORDERED.**

Date: August 8, 2006                                         **S/ ALLEN SHARP**
                                                                                  **ALLEN SHARP, JUDGE**
                                                                                  **UNITED STATES DISTRICT COURT**